IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ROBERT L. ROSENTHAL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:03-CV-0822-N |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case was tried to the Court from December 13-20, 2004. All parties appeared through counsel and announced ready for trial. Based on the evidence received at trial, together with the briefing of counsel, the Court makes the following findings of fact and conclusions of law.

### I. FINDINGS OF FACT

1. Plaintiff Robert L. Rosenthal, M.D. is a cardiologist. On January 7, 2002, Rosenthal was invited onto the premises of the Department of Veteran Affairs ("VA") Medical Center in Dallas, Texas ("VAMC Dallas"), to attend a continuing medical education seminar that Rosenthal paid $1000 to attend. Rosenthal was on the premises of VAMC Dallas at the express invitation of the VA for a purpose for which the VAMC Dallas was held open to the public.

2. The morning of January 7, 2002 was dry, and it had not rained at VAMC Dallas for at least a week previously. The temperature was below freezing.

3. Rosenthal arrived at VAMC Dallas at approximately 7:20 a.m. He proceeded to the guard station at the entrance to parking lot 1. A VA employee there directed him to a different lot; the VA employee did not warn him of any ice. Rosenthal proceeded as directed and parked in a lot near the Transitional Care Unit building ("TCU"). Rosenthal left his car and began walking through the parking lot to the main entrance of the building where the seminar was to be held.

4. As Rosenthal walked toward the main entrance, the TCU was on his left. A strip of ice ran from the sidewalk in front of the TCU across the parking lot, and in doing so ran across Rosenthal's path. The strip of ice was approximately 1-2 feet wide.

5. Rosenthal slipped on the ice and fell. The fall broke Rosenthal's ankle.

6. The strip of ice was difficult to see. It was not open and obvious.

7. Rosenthal was exercising ordinary care at the time he slipped on the ice and fell. Rosenthal was walking at a reasonable rate of speed and was reasonably attentive to his surroundings.

8. There was no warning of the ice present.

9. No steps to make the ice safe had been taken, such as application of chemicals to melt the ice, application of salt, or application of sand.

10. The ice where Rosenthal fell posed an unreasonable risk of harm.

11. LifeNet Community Behavioral Healthcare d/b/a Fairweather Associates, Inc. ("LifeNet") is a nonprofit corporation that provides employment and other services to disabled persons. LifeNet and the VA entered into a contract for LifeNet to provide certain

maintenance services for the grounds of VAMC Dallas (the "Contract"). *See* PX 5. The VA did not control the details of LifeNet's performance under the Contract. LifeNet agrees that it was an independent contractor.

12.     The Contract originally expired before January 7, 2002, and did not include the parking lot by the TCU where Rosenthal fell. LifeNet and the VA agreed to extend the Contract to a term including January 7, 2002, and to amend the Contract to include the parking lot where Rosenthal fell.

13.     With respect to LifeNet's duties regarding maintenance of parking areas due to snow and ice, the Contract provides: "During normal duty hours of 8:00 a.m. to 4:40 p.m., the Contractor shall initiate action within one hour from notification by the COTR [contracting officer's technical representative] (or his/her designee) to treat traffic surfaces. During other than normal duty hours, including weekends and holidays, the Contractor shall take action within two hours from the time he is notified by the COTR (or his/her designee) to treat traffic surfaces." PX5-008.

14.     Robert Choice, a VA employee and supervisor of the VA maintenance department, was the COTR for the LifeNet Contract. He was the primary VA employee who interacted with LifeNet on a day-to-day basis. Michael Agedbite was the LifeNet counterpart to Choice. When Choice wanted LifeNet employees to take some action, Agedbite was his primary contact.

15.     The parties disagree whether the VA directed LifeNet to remove the ice from the parking lot before Rosenthal fell on the ice.

FINDINGS OF FACT AND CONCLUSIONS OF LAW – PAGE 3

16. Choice testified that Agedbite advised him of the ice around 5:00 a.m. on January 7, 2002, and that he gave Agedbite the key to the supply room where the chemical ice melt was stored and directed Agedbite to have LifeNet employees treat the ice danger. Choice testified that Agedbite came into VAMC Dallas every day, even on his day off, in order to obtain ice from the ice maker for his residence.

17. Agedbite testified that he did not go to VAMC Dallas on January 7, 2002, that January 7, 2002 was his day off that week, that he customarily did not go to VAMC Dallas on his days off, and that Choice did not instruct him that LifeNet should treat the ice danger.

18. It seems implausible that Agedbite on his day off would go to VAMC Dallas at 5:00 a.m. in below-freezing weather in order to get ice to take back to his residence.

19. LifeNet's contemporaneous employee time records reflect that Agedbite was not on duty on January 7, 2002.

20. The Court finds by a preponderance of the evidence that Agedbite did not go into VAMC Dallas on the morning of January 7, 2002. Accordingly, the Court finds by a preponderance of the evidence that VA personnel did not direct LifeNet employees to remove or otherwise treat the ice in the parking lot on which Rosenthal slipped.

21. LifeNet did not otherwise have any independent knowledge that there was ice in the parking lot before Rosenthal fell on January 7, 2002. It is not the case that an independent contractor in the same or similar circumstances as LifeNet in the exercise of reasonable diligence should have known of the ice in the parking lot, absent being informed

by VA personnel, before Rosenthal fell on January 7, 2002. LifeNet neither knew nor should have known of the ice in the parking lot before Rosenthal fell on January 7, 2002.

22. Accordingly LifeNet did not fail to exercise ordinary care in connection with the ice in the parking lot on the morning of January 7, 2002.

23. At least one other VA employee advised Choice of the presence of the ice in the parking lot where Rosenthal fell in ample time for the VA to have taken remedial measures before Rosenthal fell.

24. The VA did not adequately warn of the ice and failed to make that condition reasonably safe before Rosenthal fell. The VA did not post any kind of warning and took no measures to melt the ice or provide a less-slippery surface for the ice, e.g., sanding it, before Rosenthal fell. The VA did not instruct LifeNet to make that condition reasonably safe or post warning signs.

25. The VA did not exercise that degree of care that would be used by an owner or occupier of premises of ordinary prudence under the same or similar circumstances in both failing to adequately warn Rosenthal of the ice in the parking lot and in failing to make that condition reasonably safe, either independently or by instructing LifeNet to treat the ice.

26. The VA's failure to warn Rosenthal of the risk of harm posed by the ice in the parking lot and to make that condition reasonably safe was a cause of Rosenthal's fall. Absent the VA's failure to warn and failure to make safe, Rosenthal would not have fallen.

27. It was reasonably foreseeable to an owner or occupier of premises, using that degree of care that a reasonably prudent owner or occupier of premises would use, that

failing to warn of the ice in the parking lot and failing to make that condition reasonably safe could cause a person to slip and fall on the ice and suffer resulting injury.

28. The source of the water that formed the ice on which Rosenthal slipped was a leak in a pipe by the TCU. The leak had been present for many weeks before January 7, 2002. The leak resulted in water flowing across the sidewalk by the TCU and across the parking lot at least once or twice a week.

29. LifeNet had no responsibility under the Contract for plumbing repairs.

30. The VA was aware of the leak for many weeks before January 7, 2002. VA plumbers made repeated attempts to repair the leak, but their efforts were not successful. The repairs were delayed for an extended period due in part to delays in obtaining needed repair materials through the VA procurement process, and in part because the VA considered repair of the leak to be a low priority.

31. It appears likely that the pipe that was leaking was part of the sprinkler system for the area around the TCU. The VA's response to the leak was to turn off the main supply valve for that part of the sprinkler system. Given the frequency at which water was observed from the leak, this was not an effective response to the condition. The VA did not post any notice by the main supply valve indicating that it should not be turned on due to a leak. It is unknown who turned on the valve that resulted in the leaked water forming the ice on which Rosenthal slipped and fell.

32. The unrepaired leak posed an unreasonable risk of harm in freezing weather.

33. The VA knew or reasonably should have known of the danger posed by the unrepaired leak in freezing weather.

34. An owner or occupier of premises of ordinary prudence under the same or similar circumstances would have repaired the leak before January 7, 2002.

35. The VA failed to exercise ordinary care to protect Rosenthal from the danger posed by the unrepaired leak by both failing to adequately warn Rosenthal of the condition and failing to make that condition reasonably safe.

36. The VA's failure to repair the leak before January 7, 2002, caused Rosenthal to slip and fall on the resulting ice and suffer injury. If the VA had repaired the leak before January 7, 2002, Rosenthal would not have fallen on the ice.

37. The VA knew that the night and morning of January 6-7, 2002, was predicted to have freezing temperatures.

38. It is reasonably foreseeable to an owner or occupier of premises of ordinary prudence under the same or similar circumstances that the unrepaired leak in the freezing weather of January 6-7, 2002, could cause a person to slip and fall on ice and suffer injury.

39. Rosenthal's fall caused his ankle to break. Absent falling, Rosenthal would not have broken his ankle.

40. Treatment of Rosenthal's broken ankle required the surgical implantation of hardware to secure the broken bones on January 12, 2002.

41.     The implanted hardware caused Rosenthal to develop blood clots including deep vein thrombosis ("DVT").  The blood clots caused Rosenthal to develop pulmonary embolism, a potentially fatal complication, on or about February 1, 2002.

42.     The DVT caused Rosenthal permanent injury to veins in his leg, called post-thrombotic syndrome ("PTS").  PTS is caused by the clot injuring the valves in the vein.  The valves normally prevent blood from flowing back down the leg, rather than toward the heart; when the valves are damaged, the blood can flow back down the leg in response to gravity when the individual stands or walks.  PTS can result in swelling and pain, which is aggravated by walking or standing for extended periods of time.  Rosenthal has severe PTS and experiences swelling, pain, and discoloration of his leg when standing or walking.  He is unable to stand or walk except for short periods of time.

43.     A principal method of addressing PTS is wearing an elastic stocking to prevent swelling and pooling of blood in the leg.  Rosenthal is a compliant patient and wears an elastic stocking as instructed by his physician.  Another method of addressing PTS is to limit standing or walking and elevate the affected leg.  Rosenthal is a complaint patient and limits standing or walking and elevates his affected leg as instructed by his physician.  Another method of addressing PTS is a program of exercise to strengthen the calf muscles and improve the resulting pumping action.  Rosenthal is a compliant patient and performs his exercises as instructed by his physician and physical therapist.  Rosenthal has acted as a person of ordinary prudence would have done under the same or similar circumstances in caring for and treating his injuries that resulted from his fall.

44. As a consequence of Rosenthal's PTS, his ability to stand and walk is limited. Because of Rosenthal's limitations on standing and walking, his ability to practice cardiology is limited. In particular, his ability to see patients in the hospital ("rounds") is limited and his ability to serve as the cardiologist designated to receive emergency calls for treatment on particular days ("call") is limited. The inability to walk rounds and take call are major limitations in the practice of cardiology.

45. Rosenthal's PTS prevents him from taking call on a regular basis and prevents him from regularly walking rounds and seeing patients in the hospital. In the normal practice of cardiology, it is common for patients to require hospitalization. Rosenthal's PTS essentially limits him to an office practice of cardiology, in which his patients are referred to other cardiologists if admitted to the hospital. This is a major limitation on his ability to practice.

46. Rosenthal is a member of HeartPlace, a physicians' practice group including cardiology. Prior to the accident at VAMC Dallas, Rosenthal was one of the leaders of HeartPlace. Following the accident, Rosenthal's ability to work at HeartPlace has been greatly diminished by his PTS. As a consequence, HeartPlace has reduced his compensation over time to reflect his diminished productivity. Additionally, Rosenthal no longer occupies a position of leadership within HeartPlace due to his inability to perform job duties as before.

47. Rosenthal has incurred lost wages in the past due to his injuries resulting from the fall at VAMC Dallas. $587,031, if paid now in cash, would fairly and reasonably

compensate Rosenthal for his loss of earning capacity sustained in the past caused by his injuries resulting from the fall.

48.    Absent the injuries resulting from the fall, Rosenthal likely would have continued working until age 60. Rosenthal will incur lost wages in the future resulting from the fall. $1,625,000, if paid now in cash, would fairly and reasonably compensate Rosenthal for his loss of earning capacity that, in reasonable probability, Rosenthal will sustain in the future, caused by his injuries resulting from the fall, discounted to present value based on the real yield of inflation-indexed U.S. Treasury securities.

49.    Rosenthal experienced physical pain when he broke his ankle. Rosenthal experienced physical pain from the surgery to repair his broken ankle. Rosenthal experienced physical pain from the rehabilitation of his broken ankle. Rosenthal experienced physical pain from the hardware used to repair his broken ankle. Rosenthal experienced physical pain from his DVT and resulting PTS. Rosenthal will continue to experience physical pain from the hardware used to repair his broken ankle for the remainder of his life. Rosenthal will continue to experience physical pain from his PTS for the remainder of his life.

50.    Rosenthal is a highly motivated, highly skilled, hard working person. As a consequence, his inability to perform after the accident as he was able to perform before has had a significant impact on him emotionally. This has caused Rosenthal depression, for which he sought and received medical and psychological treatment. The treatment Rosenthal received, including medication, has helped with his depression. It is likely that Rosenthal

will continue to experience depression for some time in the future as a result of his injuries. The Court is of the opinion that due to Rosenthal's ability, drive, and work ethic, he will find other outlets for his skills in the future and that this will substantially reduce his depression caused by his injury.

51. Rosenthal is aware of the risks of pulmonary embolism. He experienced mental distress as a result of his awareness that he had a pulmonary embolism and of the danger that posed to him.

52. As a consequence of Rosenthal's DVT and pulmonary embolism, he is at greater risk of a recurrence of DVT and/or pulmonary embolism for the remainder of his life. Rosenthal is aware of that elevated risk.

53. As a consequence of Rosenthal's DVT and pulmonary embolism, he will need to take blood thinning medication for the remainder of his life. The long term use of blood thinning medication poses certain risks of side effects, including excessive bleeding. Rosenthal is aware of that elevated risk.

54. $1,000,000, if paid now in cash, would fairly and reasonably compensate Rosenthal for his physical pain, mental anguish, disfigurement, and physical impairment sustained in the past caused by his injuries resulting from the fall.

55. $500,000, if paid now in cash, would fairly and reasonably compensate Rosenthal for his physical pain, mental anguish, disfigurement, and physical impairment that, in reasonable probability, he will sustain in the future caused by his injuries resulting from the fall.

56.   The loss of earning capacity, physical pain, mental anguish, disfigurement, and physical impairment discussed above were caused by Rosenthal's fall, and would not have occurred in the absence of that fall.  A person using ordinary care could have foreseen that those injuries, or similar injuries, might reasonably result from Rosenthal's fall.

57.   After the surgery to repair Rosenthal's broken ankle, Rosenthal declined an injection of Lovenox as he was leaving the hospital.  To a reasonable medical probability, Rosenthal's decision to decline the injection of Lovenox did not cause his subsequent complications, including DVT, PTS, and pulmonary embolism.  Rosenthal's decision to decline the injection of Lovenox was not a failure to have acted as a person of ordinary prudence would have done under the same or similar circumstances in caring for and treating Rosenthal's injuries resulting from his fall at VAMC Dallas.

58.   Rosenthal's father had a history of DVT.  Rosenthal did not disclose to the physicians treating his broken ankle that his father had a history of DVT.  Rosenthal's failure to disclose his father's history of DVT to his treating physicians was not a failure to have acted as a person of ordinary prudence would have done under the same or similar circumstances in caring for and treating Rosenthal's injuries resulting from his fall at VAMC Dallas.

59.   For two or three days before Rosenthal was diagnosed with pulmonary embolism, he experienced mild shortness of breath.  He did not seek medical care until February 1, 2002, when the symptoms worsened significantly.  Rosenthal's failure to seek medical care for his shortness of breath before February 1, 2002, was not a failure to have

acted as a person of ordinary prudence would have done under the same or similar circumstances in caring for and treating Rosenthal's injuries resulting from his fall at VAMC Dallas.

60. Rosenthal has declined to undergo additional surgery to remove the plate and screws used to repair his broken ankle. Rosenthal's failure to remove the plate and screws was not a failure to have acted as a person of ordinary prudence would have done under the same or similar circumstances in caring for and treating Rosenthal's injuries resulting from his fall at VAMC Dallas.

61. Rosenthal has not used a motorized scooter to facilitate his mobility and perhaps enable him to perform rounds or take call. Performing rounds and taking call requires the cardiologist to stand and move around to examine the patient; it is not simply a matter of getting from point A to point B. Thus, a motorized scooter would not materially improve Rosenthal's ability to perform rounds or take call. Rosenthal's failure to use a motorized scooter was not a failure to have acted as a person of ordinary prudence would have done under the same or similar circumstances in caring for and treating Rosenthal's injuries resulting from his fall at VAMC Dallas.

62. Rosenthal has not otherwise failed to have acted as a person of ordinary prudence would have done under the same or similar circumstances in caring for and treating Rosenthal's injuries resulting from his fall at VAMC Dallas.

63. All findings of fact that are more properly viewed as conclusions of law are also adopted by the Court as conclusions of law.

## CONCLUSIONS OF LAW

1. The Court has personal jurisdiction over the parties to this action.

2. The Department of Veteran Affairs is an executive department of the United States. 38 U.S.C. § 301.

3. Rosenthal brings this action against the United States under the Federal Tort Claims Act ("FTCA"). 28 U.S.C. § 1346(b)(1). Rosenthal has complied with all administrative conditions precedent required under the FTCA.

4. This Court does not have subject matter jurisdiction under the FTCA over claims brought against the United States for the acts or omissions of an independent contractor. *United States v. Orleans*, 425 U.S. 807, 813-14 (1976); *Alexander v. United States*, 605 F.2d 828, 833-34 (5th Cir. 1979).

5. LifeNet was an independent contractor under the Contract.

6. LifeNet had no duty under the Contract to treat or otherwise address ice until it was notified by the COTR. The COTR did not notify LifeNet to remove or otherwise address the ice in the parking lot before Rosenthal fell on January 7, 2002. Accordingly, LifeNet had no duty under the Contract to treat or otherwise address the ice in the parking lot before Rosenthal fell.

7. Rosenthal does not seek recovery from the United States for the negligence of LifeNet.

8.    Rosenthal seeks recover from the United States for the negligence of the VA itself both in failing to address the ice in the parking lot and in creating that hazardous condition.

9.    Rosenthal's claims thus fall within the waiver of sovereign immunity of the FTCA. The Court, therefore, has subject matter jurisdiction over Rosenthal's claims.

10.   Under the FTCA the Court applies the substantive tort law of the forum state. Under Texas law, an owner or occupier of premises is negligent with respect to an invitee regarding the condition of the premises if (a) the condition posed an unreasonable risk of harm, (b) the owner or occupier knew or reasonably should have known of the danger, and (c) the owner or occupier failed to exercise ordinary care to protect the invitee from the danger, by both failing to adequately warn the invitee of the condition and failing to make that condition reasonably safe. "Ordinary care," when used with respect to the conduct of an owner or occupier of a premises, means that degree of care that would be used by an owner or occupier of ordinary prudence under the same or similar circumstances.

11.   Rosenthal was an invitee of the VA.

12.   The VA was negligent in failing to exercise ordinary care to protect Rosenthal from the danger posed by the ice in the parking lot, by both failing to adequately warn Rosenthal of the condition and failing to make that condition reasonably safe, including but not limited to failing to instruct LifeNet to treat the ice or post warning signs. This negligence was a proximate cause of Rosenthal's fall.

13. The VA was negligent in failing to exercise ordinary care to repair the leak at the TCU before January 7, 2002. This negligence was a proximate cause of Rosenthal's fall.

14. Rosenthal's fall was a proximate cause of his subsequent injuries, including his broken ankle, the placement of hardware to repair his broken ankle, his DVT, his pulmonary embolism, and his PTS, as well as Rosenthal's damages caused by those injuries.

15. Lifenet was not negligent in connection with Rosenthal's fall.

16. Rosenthal was not negligent in connection with his fall.

17. Rosenthal did not fail to mitigate his damages.

18. Rosenthal is entitled to recover money damages from the United States for his injuries and other damages proximately caused by the VA in the following amounts:

    a. loss of earning capacity in the past      $587,031

    b. loss of earning capacity in the future      $1,625,000

    c. physical pain, mental anguish, disfigurement, and physical impairment in the past      $1,000,000

    d. physical pain, mental anguish, disfigurement, and physical impairment in the future      $500,000

19. Rosenthal takes nothing by his claims against LifeNet. The United States takes nothing by its third-party claims against LifeNet.

20. All conclusions of law that are more properly viewed as findings of fact are also adopted by the Court as findings of fact.

Signed April 20, 2005.

                                                        David C. Godbey
                                        United States District Judge